UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRUCE M. DIXON,

Plaintiff,

v.

PARTIDA, et al.,

Defendants.

Case No.  22-cv-04461-AMO

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 115, 122

In this Section 1983 case, Bruce Dixon, a prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), brings claims of deliberate indifference and equal protection violations against CDCR officials and medical providers.  Defendants' motion for summary judgment was heard before this Court on October 2, 2025.  Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court hereby **GRANTS in part and DENIES in part** Defendants' motion for the following reasons.

I.      **BACKGROUND**

A.      **Factual Background**

Dixon has been under the care of CDCR for over 25 years.  While incarcerated, Dixon has struggled with serious mental health challenges and has been diagnosed with several mental health conditions.[1]  Virani Decl., Ex. 1 at AGO 00010-19.  At least as early as 2016, Dixon has been

---

[1] Dixon filed an administrative motion to file under seal portions of his Opposition brief and supporting exhibits.  *See* Dkt. No. 122.  Dixon seeks to seal certain portions of the record that contain or discuss his personal health and medical information.  *See* Yin Decl. ¶ 3.  Defendants did not file an opposition to sealing.  The Court GRANTS the administrative motion to file under seal.

prescribed the antipsychotic medication Clozapine (trade name Clozaril).[2]  Virani Decl., Ex. 2 at AGO 44518.

### 1.    Clozaril Background

Clozaril is a powerful medication used to treat severe mental illness, but its use is associated with serious potential side effects, including vulnerability to infection, low blood pressure, slow heart rate, loss of consciousness, seizures, inflammation or enlargement of the heart, drowsiness, dizziness, headaches, tremors, visual disturbances, nausea, and fever.  Because of the complex nature of Clozaril treatment, CDCR policy requires prisoners on Clozaril to be housed at specific institutions that are qualified to administer and monitor patients on Clozaril. Virani Decl., Ex. 3 at AGO 79262.  These institutions are designated within CDCR as Clozapine (Clozaril) maintenance facilities. *Id.*

When Clozaril is administered to a patient, four different teams must work together to provide adequate care: nursing, pharmacy, psychiatry, and laboratory.  Virani Decl., Ex. 4 at AGO 79541; Ex. 5 ("Crayton Dep.") at 159:1-160:9.  Nurses are particularly important in the administration of Clozaril because they regularly conduct patient assessments, which involve recording vital signs and checking for bowel function and hypersalivation.  *See* Crayton Dep. at 40:21-25.  CDCR policy requires that Clozaril maintenance facilities provide continuous monitoring and must comply with the Clozaril Risk Evaluation and Mitigation Strategy ("REMS") program, an FDA-mandated program which ensures that facilities can maintain an adequate and stable supply of Clozaril.  Virani Decl., Ex. 3 at AGO 79261-63.  To safely house an inmate on Clozaril, it is necessary to have a stable supply of Clozaril.  Clark Dep. at 79:11-80:14.  Clozaril is not considered a difficult medication for the prison pharmacy to obtain as it has been around for over 35 years and is readily available.  *Id.* at 79:11-80:14.  In the normal course of administration, the pharmacist checks the patient's labs to make sure they were drawn, that the levels were normal, and then dispenses the medication.  *Id.* at 79:11-80:14.  Due to the close monitoring that is necessary of a patient taking Clozaril, however, CDCR has only approved a limited number of

---

[2] For purposes of this order, the Court uses the names Clozapine and Clozaril interchangeably.

1    institutions for the maintenance of inmates with prescriptions for Clozaril.  Crayton Decl. ¶ 4

2    (ECF No. 19-1).  One of these institutions is the Psychiatric Inpatient Program (PIP) at Salinas

3    Valley State Prison ("SVSP").  *Id.*

4                    **2.    Placement of Dixon**

5            In August 2021, Dixon was transferred to SVSP-PIP.  Virani Decl., Ex. 7 at AGO 76625.

6    On December 29, 2021, Dixon was transferred to SVSP's enhanced outpatient program ("SVSP-

7    EOP"), which was not a Clozaril maintenance facility.  Virani Decl., Ex. 8 at AGO 76958;

8    Crayton Dep. at 51:24-52:1 (explaining that it was "well known that [SVSP-EOP] was not a

9    [Clozaril] maintenance facility"); *see e.g.*, Virani Decl., Ex. 9 ("Gaither Dep.") at 40:8-16 (same).

10   CDCR employees testified that SVSP-EOP's pharmacy and nursing staff were inadequately

11   equipped to handle Clozaril patients.  Crayton Dep. at 44:7-18; Virani Decl., Ex. 10 ("Sawyer

12   Dep.") at 77:23-79:24.  Defendant Eugene Crayton, SVSP's Chief Psychiatrist, described Dixon's

13   transfer to SVSP-EOP as "a complete surprise," "a mystery," and "highly unusual and

14   unexpected."  Crayton Dep. at 51:13-16.  On December 30, 2021, CDCR Chief Psychiatrist Dr.

15   Michael Golding emphasized to the medical team at SVSP-EOP that Dixon should not be taken

16   off Clozaril and must be transferred to a Clozaril maintenance facility where he could receive

17   proper care.  Virani Decl., Ex. 11 at AGO 77474-75.  Multiple other staff expressed similar

18   concerns, stating that Dixon's "mental health ha[d] clearly been impacted by the transfer delays,"

19   that the lack of timely updates on his weekly labs created "increased risks of adverse outcomes for

20   continued use of this medication," and that he should be transferred to a Clozaril maintenance

21   facility.  Virani Decl., Ex. 28 at AGO 77549; Ex. 32 at AGO 77494-96; Ex. 12 at AGO 77505-07.

22           An Institution Classification Committee ("ICC") meeting concerning Dixon took place on

23   March 24, 2022.  Sinclair Decl., Ex. A.  The ICC participants noted that Dixon's psychiatrist at

24   SVSP had recommended that Dixon be transferred to an institution which specializes in Clozapine

25   treatment.  *Id.*  The participants noted, however, that Dixon was a level 4 inmate and that he had

26   enemies at all other level 4 general population institutions.  *Id.*  Because of this, he was described

27   as a "difficult to place case."  *Id.*  Valley State Prison ("VSP") and Mule Creek State Prison

28   ("MCSP") were the only general population institutions then capable of maintaining Dixon on

Clozapine, but both prisons were designated for level 2 inmates. *Id.* A level 2 facility is a lower-level facility, while a level 4 facility is high security. Wilson Decl., Ex. B ("Clark Dep.") at 77:3:17. The ICC therefore recommended an override and that Dixon be transferred to VSP or, alternatively, MCSP. Sinclair Decl., Ex. A. One of the members of this ICC was Solis. *Id.*

The recommendation of the ICC was then reviewed by Davis on April 5, 2022. Sinclair Decl., Ex. A. Given Dixon's classification as a difficult to place case, and because the ICC requested an override to send a level 4 inmate to a level 2 institution, Davis requested clarification on whether a conference call with the Clozapine designated facilities had taken place. *Id.*

On May 26, 2022, another ICC was held concerning Dixon. Sinclair Decl., Ex. B; Mondragon Decl. ¶ 3. It was again noted that Dixon's psychiatrist had recommended Dixon's transfer to an institution specializing in Clozapine treatment. Sinlair Decl., Ex. B. The ICC also noted, again, that Dixon was a level 4 inmate with enemies at all other level 4 general population institutions. *Id.* The ICC therefore recommended that Dixon be transferred to MCSP, which was a level 2 institution. Sinclair Decl., Ex. B; Mondragon Decl. ¶ 3. Mondragon and Borla were members of the May 26, 2022 ICC. Sinclair Decl., Ex. B.

In June 2022, the Population Management Unit (PMU) within CDCR strove to determine where Dixon could be safely housed from a custody standpoint. Foss Decl. ¶ 3; Mondragon Decl. ¶ 3. Because there were overlapping custody and medical issues involved in Dixon's placement, PMU contacted Foss. Foss Decl. ¶ 3. Foss acted as liaison between PMU and the medical staff at CDCR headquarters. *Id.* Foss referred the matter to the medical staff who determined that Dixon's medical needs could be adequately addressed at SVSP. Foss Decl. ¶ 3; Mondragon Decl. ¶ 3. Foss then communicated this determination to PMU. Foss Decl. ¶ 3.

Clark was the deputy director of operations and had the responsibility of managing and working with regional administrators to help manage health care at the institutions. Clark Dep. at 27:20-28:18. Clark decided, in consultation with the regional administrators, that Dixon could remain at SVSP in the outpatient unit. *Id.* at 52:12-15. This was based on the general principle that, at pretty much every prison, a patient's medical needs can be met. *Id.* at 40:4-41:6. Clark based her decision that Dixon's medical needs could be safely addressed in the SVSP outpatient

1    unit on her understanding that there were no issues regarding the SVSP pharmacy. *Id.* at 79:11-
2    80:14.

3        Dr. Crayton is the Chief Psychiatrist at SVSP. Crayton Decl. ¶ 1 (ECF. No. 19-1). He was
4    contacted by the statewide chief psychiatrist of CDCR and the chief of mental health and asked if
5    the medical staff at SVSP could adequately take care of Dixon's medical needs, knowing that he
6    was on Clozapine. Crayton Decl. ¶ 5; Wilson Decl., Ex. C ("Crayton Dep.") at 31:17-32:20. Dr.
7    Crayton determined that the outpatient unit could provide the necessary care to monitor Dixon's
8    use of Clozapine. Crayton Decl. ¶ 5. Crayton has never met Dixon in person nor examined him.
9    Crayton Dep. at 33:3-25.

10        The ICC's recommendation was then reviewed by Hammond on June 14, 2022. Sinclair
11    Decl., Ex. B. She stated that a new committee action was required so that staff could review
12    Dixon's retention at SVSP. *Id.*

13        A subsequent ICC was held on June 17, 2022. Sinclair Decl., Ex. C; Mondragon Decl. ¶ 4.
14    Because stakeholders had earlier determined that Dixon could be safely maintained on Clozapine
15    in the outpatient unit at SVSP and because Dixon had documented enemies at all other level 4
16    institutions, the ICC recommended that Dixon remain at SVSP. *Id.* Mondragon and Solis were
17    members of this ICC. *Id.* The recommendation of the latest ICC was reviewed by Hammond on
18    July 18, 2022. Sinclair Decl., Ex. C. Hammond determined that, from a custody perspective,
19    Dixon could remain housed at SVSP. Hammond Decl. ¶ 3. Therefore, Hammond endorsed the
20    ICC recommendation that Dixon remain at SVSP. Sinclair Decl., Ex. C. Hammond had no role in
21    determining that, from a medical perspective, Dixon could remain at SVSP. Hammond Decl. ¶ 3.

22              **3.    Harm to Dixon**

23        While housed at SVSP-EOP, Dixon did not receive consistent Clozaril monitoring, which
24    resulted in unaddressed side effects including weight gain, blurred vision, spinning sensations,
25    fatigue, and sedation. Virani Decl., Ex. 13 ("Dixon Dep.") at 31:21-34:15. Because SVSP-EOP
26    was not a Clozaril maintenance facility, rather that SVSP-EOP staff being responsible for giving
27    Dixon his Clozaril medication, Dixon held responsibility to obtain it by walking across the yard
28    and waiting in line outside, a burdensome task given Dixon's mobility issues that require him to

use a walker. Dixon Dep. at 39:8-11; Virani Decl., Ex. 14 at AGO 77435-37. Dixon experienced frustration and depression as a result of being improperly housed. Virani Decl., Ex. 15 at AGO 37231. Dixon wrote to CDCR's Office of Internal Affairs asking for help, and also submitted multiple formal requests to be transferred to a Clozaril maintenance facility. Dkt. No. 1-1 at 6-9, 15, 17.

On May 2, 2022, Dixon swallowed two razor blades, telling custody staff that he wanted to be admitted to a mental health crisis bed because he was unable to obtain a transfer. Virani Decl., Ex. 20 at AGO 02024-25. Dixon stated that he resorted to self-harm because his attempts to go through proper channels to be transferred had been unsuccessful. *Id.* Even though Dixon told staff that he would continue to harm himself if he was returned to current housing, SVSP staff returned Dixon to his cell. *Id.* Dixon then cut himself with a razor, had to be treated for lacerations, and a later X-ray confirmed the presence of razor blades in his gut. *Id.*

On July 7, 2022, SVSP-EOP's pharmacy ran out of Clozaril and was not able to restock the medication until July 12, 2022, resulting in Dixon missing his medication for five days. Virani Decl., Ex. 26 at AGO 36771. Dixon's primary care physician, Dr. Romeo Mariano, reported that this disruption in Dixon's Clozaril prescription resulted in a "deterioration in function," "thoughts of suicide," and impacted his stability level on the medication. *Id.* Dixon experienced a multitude of withdrawal symptoms including "chills, headache, insomnia, nausea," as well as "abdominal pains," "flu symptoms . . . [and] thoughts of suicide." *Id.*; Dixon Dep. at 40:4-41:18.

**B.    Procedural History**

On August 2, 2022, Dixon filed a pro se Complaint, requesting, in part, immediate transfer to a Clozaril maintenance facility. Dkt. No. 1. On December 2, 2022, the Court, Judge Jon S. Tigar presiding, granted Dixon's request, ordering Defendants to transfer him to a Clozaril maintenance facility. Dkt. No. 28 at 12-13. With the assistance of counsel, Dixon filed an amended complaint. Dkt. No. 66. Therein, Dixon brings the following claims: (1) deliberate indifference to medical needs in violation of the Eighth Amendment; (2) a denial of equal protection of the laws in violation of the Fourteenth Amendment; (3) deliberate indifference to medical needs in violation of article 1, section 17, of the California Constitution; (4) a denial of

equal protection of the laws in violation of article 1, section 7, of the California Constitution; (5) intentional infliction of emotional distress ("IIED"); (6) negligence; and (7) negligent infliction of emotional distress ("NIED").

## II.    DISCUSSION

Defendants assert that they are entitled to summary judgment on all Dixon's claims. The Court explains the legal standard that applies to their motion and then examines Defendants' arguments with regard to each claim in turn.

### A.    Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving

United States District Court
Northern District of California

party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105-06 (9th Cir. 2000); *see also Celotex*, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case). Indeed, where the nonmoving party bears the burden of proof at trial, its burden of production in opposing a motion for summary judgment " 'is not a light one' – it 'must show more than the mere existence of a scintilla of evidence' or 'some "metaphysical doubt" as to the material facts at issue.' " *Pac. Gulf Shipping Co. v. Vigorous Shipping & Trading S.A.*, 992 F.3d 893, 897 (9th Cir. 2021) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)).

### B.    Eighth Amendment – Deliberate Indifference

Deliberate indifference to serious medical needs violates a prisoner's Eighth Amendment rights. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). "In the Ninth Circuit, the test for deliberate indifference consists of two parts." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). "First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 1096 (internal quotation marks, citations omitted). "Second, the plaintiff must show the defendant's response to the need was deliberately indifferent." *Id.* at 1096 (citation omitted).

Related to the first prong, "[e]xamples of serious medical needs include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). Here, there appears to be no dispute that Dixon has serious medical needs. Indeed, the record shows that Dixon's mental health issues, Clozaril regimen, and associated side effects constituted "a medical

United States District Court
Northern District of California

1    condition that significantly affects an individual's daily activities" sufficient to satisfy this part of

2    the test.  *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).

3          The real dispute relates to the second prong of the test – deliberate indifference.  This

4    second prong breaks down further into two subparts and is satisfied by showing both (a) a

5    purposeful act or failure to act to respond to a prisoner's pain or possible medical need and

6    (b) harm caused by the indifference.  *Jett*, 439 F.3d at 1096.  Deliberate indifference is established

7    only where the defendant subjectively "knows of and disregards an excessive risk to inmate health

8    and safety."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation and internal

9    quotation marks omitted).  A difference of opinion about the proper course of treatment is not

10   deliberate indifference, nor does a dispute between a prisoner and prison officials over the

11   necessity for or extent of medical treatment amount to a constitutional violation.  *See, e.g.*,

12   *Toguchi*, 391 F.3d at 1058; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  "An inadvertent or

13   negligent failure to provide adequate medical care is insufficient to establish a claim under the

14   Eighth Amendment."  *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (citing *Estelle*,

15   429 U.S. at 105-06).  In other words, "[m]edical malpractice does not become a constitutional

16   violation merely because the victim is a prisoner."  *Edmo*, 935 F.3d at 786 (quoting *Estelle*, 429

17   U.S. at 106).  Most plainly, "[t]o show deliberate indifference, the plaintiff must show that the

18   course of treatment the [official] chose was medically unacceptable under the circumstances and

19   that the [official] chose this course in conscious disregard of an excessive risk to the plaintiff's

20   health."  *Edmo*, 935 F.3d at 786 (internal quotation marks, citations omitted).

21         The parties' dispute centers on whether Defendants committed a purposeful act or failed to

22   act to respond to Dixon's medical need.  Defendants contend they are entitled to summary

23   judgment because: (1) the majority of the named Defendants lacked authority and involvement in

24   deciding that Dixon's medical needs could be safely addressed at SVSP; and (2) the individuals

25   that Defendants concede were involved in that decision – Crayton and Clark – were not

26   deliberately indifferent to Dixon's medical needs.  Mot. at 10-15.  The Court first considers the

27   claim of deliberate indifference as to Crayton and Clark.

28

United States District Court
Northern District of California

9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1.        Crayton and Clark

To distill the issues, the Court begins by identifying the elements not in dispute.  There is no dispute that Crayton and Clark were aware of Dixon's serious medical needs – documents show that both were aware of the difficulties and associated risks of administering Clozapine to Dixon at SVSP-EOP.  *See* Crayton Dep. at 151, 251-52 & Exs. 26-30 (records showing Crayton's awareness of risks); Clark Dep. at 52 & Exs. 19, 22, 31 (records showing Clark's awareness of risks).  Further, there is no dispute that Dixon suffered harm as a result of his placement at SVSP-EOP.  From July 7, 2022, to July 12, 2022, SVSP-EOP's pharmacy ran out of Clozaril, which meant that Dixon did not receive this critical medication for five days in a row and suffered serious withdrawal symptoms, including heightened suicidal ideation.  *See* Ex. 26 at AGO 36771-72; *see also* Crayton Dep. at 61:17-22; Dixon Dep. at 32:19-36:12, 41:4-43:5; *see Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010) (citation omitted) ("A heightened suicide risk . . . is a serious medical need.").

The dispute thus centers on whether Crayton and Clarks' respective decisions were medically unacceptable.  Defendants argue that a patient's medical needs can generally be met at any prison.  *See* Wilson Decl., Ex. B ("Clark Dep.," Dkt. No. 115-10) at 40:4-41:6.  Indeed, Defendants repeatedly cite Clark's deposition for the premise that an inmate can safely be housed on Clozapine so long as the facility can establish a stable supply of the readily-available drug.  *Id.* at 79:11-80:14.  Clark based her decision that Dixon's medical needs could be safely addressed in SVSP-EOP on her understanding that there were no issues regarding the pharmacy at SVSP.  *Id.* at 79:11-80:14.  Crayton determined that the outpatient unit could provide the necessary care to monitor Dixon's use of Clozapine.  Crayton Decl. (Dkt. No. 19-1) ¶ 5.  On this basis, Defendants suggest that Dixon presents nothing more than a difference of opinion regarding the appropriate course of treatment, a difference of opinion that cannot rise to the level of an Eighth Amendment violation.  *See, e.g.*, Reply at 4-5.

However, taken in the light most favorable to Dixon, a trier of fact could conclude that Crayton and Clark were "aware of the facts from which an inference could be drawn about the outstanding risk" posed by unsafely housing Dixon at SVSP-EOP.  *See Disability Rts. Montana,*

United States District Court
Northern District of California

1    *Inc. v. Batista*, 930 F.3d 1090, 1101 (9th Cir. 2019).  A jury could reasonably view Crayton's

2    decision to place Dixon as medically unacceptable where his testimony acknowledged that SVSP-

3    EOP was ill-equipped to administer Dixon's Clozaril prescription.  For instance, with respect to

4    the SVSP-EOP pharmacy running out of Clozaril, Crayton testified that SVSP-EOP employees

5    had "protested the fact that Mr. Dixon had been transferred there in the first place, and now it

6    appeared that . . . the proper safeguards weren't being put in place to at least make sure he had the

7    medication."  Crayton Dep. at 249:12-21.  Acknowledging that the SVSP-EOP pharmacy ran out

8    of the necessary medication for several days, Crayton testified that "there clearly could have been

9    and should have been more communication from the pharmacy staff . . . something went wrong

10   with the pharmacy process."  *Id.* at 246:9-22.  Crayton also acknowledged that SVSP-EOP did not

11   receive any additional nursing staff or provide additional training to the existing nursing staff to

12   retain Dixon at the facility.  *Id.* at 65:1-21, 159:22-160:9.  For Clark's part, a jury could view her

13   decision to place Dixon at SVSP-EOP as medically unacceptable where she ignored the

14   recommendations of two ICCs, which relied on the medical opinions of Dixon's primary care

15   physician and SVSP's Chief of Mental Health, as well as Dixon's Medical Classification

16   Chronology  – all of which required Dixon to be housed at a Clozaril maintenance facility.  *See*

17   Virani Decl., Ex. 32 at AGO 77494-96.

18         Defendants' characterization of the dispute as a mere difference of opinion thus misses the

19   mark.  The evidence in the record does not reveal a mere difference of opinion regarding the

20   appropriate course of medical treatment.  The parties argue at length as to whether Dixon could

21   safely remain at SVSP-EOP, contrary to CDCR policy designating only certain facilities for the

22   maintenance of Clozaril prescription regimens.  To that end, a disputed issue of material fact

23   remains as to whether the "chosen course of treatment 'was medically unacceptable under the

24   circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's]

25   health.' "  *Toguchi*, 391 F.3d at 1058 (alteration in original, citation omitted); *see also Snow v.*

26   *McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) ("The defendants argue that this was merely a

27   difference of opinion that cannot amount to deliberate indifference.  We disagree.  Based on the

28   unchallenged medical records and inferences drawn in favor of Snow, a reasonable jury could

United States District Court
Northern District of California

1   conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the

2   recommendations for surgery was medically unacceptable under all of the circumstances.").

3   Further still, there exists a dispute of material fact as to whether Dixon could stay housed at

4   SVSP-EOP because, while Defendants assert that CDCR can meet a patient's medical needs at

5   pretty much every prison, Clark Dep. at 40:4-41:6, Dixon points to Crayton's testimony that

6   "[d]ue to the requirements that patients on Clozapine require, the Department of Corrections has

7   identified only a specific few institutions to be classified as Clozaril maintenance facilities,"

8   Crayton Dep. at 41:25-42:3, and SVSP-EOP was not so classified.  The Court accordingly cannot

9   resolve the issue of Crayton and Clarks' deliberate indifference as a matter of law and must deny

10  summary judgment on the Eighth Amendment claim against Crayton and Clark.

### 2.   Custodial Defendants

12      As with Crayton and Clark, the parties agree that the Custodial Defendants were aware of

13  Dixon's serious medical needs – record evidence reveals that they all were aware of the

14  difficulties and associated risks of administering Clozapine to Dixon at SVSP-EOP.[3]  The dispute

15  regarding the Custodial Defendants centers on whether the Custodial Defendants can be held

16  liable for deliberate indifference for the decisions to keep Dixon at SVSP-EOP.  Dixon advances

17  that the Custodial Defendants may be held liable for deliberate indifference as "integral

18  participants."  *See* Opp. at 17-18 (Dkt. No. 20 at 23-24).  The Custodial Defendants argue that

19  they cannot be held liable for deliberate indifference because they lacked decisional authority.

20  Reply at 2-6.

21      The Ninth Circuit has recognized that an officer can be held liable for a constitutional

22  violation under Section 1983 if they had "integral participation" in the alleged violation, even

23  where the officers' actions themselves do not rise to the level of a constitutional violation.

24  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007).  Integral participation

25  requires "some fundamental involvement in the conduct that allegedly caused the violation."  *Id.*

---

[3] Defendants Gaither, Hammond, Foss, Curiel, Solis, Davis, and Mondragon are referred to as the "Custodial Defendants."  Between the Opposition and Reply briefs, the parties stipulated to the dismissal of Partida, Gamboa, and Borla.  Dkt. No. 125.

1   Integral participation by each officer serves as a predicate to liability, and liability cannot attach to

2   " 'a mere bystander' who had no role in the unlawful conduct[.]"  *Boyd v. Benton County*, 374

3   F.3d 773, 780 (9th Cir. 2004) (citation omitted).  The Ninth Circuit clarified that

4               an actor may be deemed to have "cause[d] [a plaintiff] to be
                subjected" to a constitutional violation, 42 U.S.C. § 1983, and thus
5               to be an integral participant in the violation, only if (1) the defendant
                knew about and acquiesced in the constitutionally defective conduct
6               as part of a common plan with those whose conduct constituted the
                violation, or (2) the defendant set in motion a series of acts by others
7               which the defendant knew or reasonably should have known would
                cause others to inflict the constitutional injury.
8

9   *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022).

10          Two cases in particular illustrate the distinction between mere bystander and integral

11  participant.  In *Blankenhorn*, the court found that some officers were integral participants, but not

12  others.  *Id.*, 485 F.3d at 481 n.12.  There, the plaintiff alleged that excessive force was used during

13  his arrest, which included the application of hobble restraints after officers gained control over

14  him.  *Id.*  The Ninth Circuit held that one officer was not an integral participant in the arrest

15  because he did not "arrive[ ] on the scene [until] after the arrest was completed."  *Id.*  Another

16  officer "at most provided crowd control" and thus 'did not participate in any integral way in the

17  arrest.' "  *Id.*  A third officer, however, was an integral participant because he helped to handcuff

18  the plaintiff while he was prone:

19              It is true that [plaintiff] Blankenhorn does not claim [defendant]
                Kayano used excessive force in handcuffing him, and Ross, not
20              Kayano, placed the [hobble restraints] on Blankenhorn's wrists and
                ankles.  But Kayano's own declaration indicates that his help in
21              handcuffing Blankenhorn was instrumental in the officers' gaining
                control of Blankenhorn, which culminated in Ross's application of
22              hobble restraints.  Therefore, Kayano's participation was integral to
                the use of the hobble restraints.
23

24  *Id.* at 481 n.12.  In the second illustrative case, *Boyd v. Benton County*, a supervisory officer

25  determined that a "flash-bang" device should be used to gain entry and secure an apartment that

26  law enforcement was authorized to search and where armed individuals might be.  *See id.*, 374

27  F.3d at 776.  On appeal, the defendants argued that only the individual officer who deployed the

28

United States District Court
Northern District of California

13

1    flash-bang could be held liable.  The Ninth Circuit disagreed.  While a "mere bystander" could not

2    be held liable,

> [t]he facts of this case clearly support a finding that each officer
> involved in the search operation was an "integral participant."  First,
> . . . the officers in this case stood armed behind Ellison while he
> reached into the doorway and deployed the flash-bang.  Second, the
> use of the flash-bang was part of the search operation in which every
> officer participated in some meaningful way.  Third, every officer
> was aware of the decision to use the flash-bang, did not object to it,
> and participated in the search operation knowing the flash-bang was
> to be deployed.

8    *Id.* at 780.

9        Here, Defendants do not address the legal substance of Dixon's charge of integral

10   participation, instead pointing to sections of the factual record to minimize the Custodial

11   Defendants' respective roles in retaining Dixon at SVSP-EOP.  *See* Reply at 2-6.  Though

12   Defendants in fact seek to characterize their involvement as "mere bystanders," they fail to

13   identify any authority which supports their position.  The record instead reveals the Custodial

14   Defendants could be held liable because they "knew about and acquiesced" in the failure to

15   transfer Dixon out of SVSP-EOP, engaging in conduct more significant than merely providing

16   ancillary crowd control.  *Cf. Blankehorn*, 485 F.3d at 481 n.12.

17       For example, Custodial Defendant Gaither knew Dixon was on Clozaril, that Dixon's

18   medical providers were concerned about his continued detention at SVSP-EOP, and that CSU had

19   recommended he be transferred to a Clozaril maintenance facility.  *See, e.g.*, Virani Decl., Ex. 14

20   at AGO 77434-35.  The same is true for Curiel, a correctional counselor, who participated in e-

21   mail communications discussing (i) Gaither's accidental transfer of Dixon to SVSP-EOP,

22   (ii) SVSP-EOP's status as "not a clozapine maintenance institution[,]" and (iii) that CDCR staff

23   understood Dixon needed to be transferred out of SVSP-EOP as early as January 2022.  Virani

24   Decl., Ex. 32 at AGO 77494-96.  Similarly, Foss, the CCHCS Director of Corrections Services,

25   participated in a "difficult to place" conference call during which Dixon's "case factors,"

26   including his Clozaril prescription, were considered.  *See, e.g.*, Virani Decl., Ex. 19 at AGO

27   77426.

28

United States District Court
Northern District of California

1    Custodial Defendants Davis and Hammond aver that they were mere bystanders because

2    they did nothing more than review the March 30, 2022 and June 2, 2022 ICCs' recommendations

3    to transfer Dixon to a Clozaril maintenance facility.  *See* Mot. at 10; *see also* Dkt. No. 115-9, Ex.

4    A (March 30, 2022 ICC); *id.*, Ex. B (June 2, 2022 ICC).  Dixon testified, on the other hand, that

5    both Davis and Hammond failed to approve his transfer to an appropriate facility.  *See* Dixon Dep.

6    Tr. at 63:3-15 (Davis), *id.* at 62:2-19 (Hammond).  Though Davis and Hammond contend they

7    merely acquiesced to Dixon's continued detention at SVSP-EOP, they fail to point to any contrary

8    record evidence regarding the limitations of their authority over Dixon's placement.

9    Custodial Defendants Solis and Mondragon participated in ICCs where Dixon's case

10    factors were discussed and analyzed.  The ICC held on March 30, 2022 – that both Solis and

11    Mondragon attended – considered evidence including (i) a statement from Dixon's primary care

12    physician Dr. Mariano that "given the difficulty of treating Mr. Dixon at SVSP with Clozapine

13    without staff such as nursing staff to help examine him regularly and monitor his treatment,"

14    Dixon should be transferred to a Clozaril maintenance facility (Virani Decl., Ex. 12 at AGO

15    77505), (ii) SVSP Chief of Mental Health Dr. Yanez's concerns with retaining Dixon at SVSP-

16    EOP (*id.*), and (iii) Dixon's Medical Classification Chronology which stated that he "MUST BE

17    ENDORSED TO INSTITUTION CAPABLE OF PRESCRIBING CLOZARIL," (Virani Decl.,

18    Ex. 32 at AGO 77494-96; Dkt. No. 115-9, Ex. A (March 30, 2022 ICC) (all-caps in original)).

19    Both Solis and Mondragon also participated in an ICC that approved a directive to keep Dixon at

20    SVSP-EOP.  Dkt. No. 115-9, Ex. C (June 21, 2022 ICC).  Reviewing these records in the light

21    most favorable to Dixon, the Court cannot conclude as a matter of law that any of Custodial

22    Defendants were mere bystanders sufficient to avoid liability for deliberate indifference.

23    After establishing integral participant liability for the Custodial Defendants, the analysis

24    turns to whether their conduct rises to the level of deliberate indifference.  Defendants argue

25    throughout their papers that they cannot be held liable for deliberate indifference to Dixon's

26    medical needs because, based on the premise that a patient's medical needs could be met "at pretty

27    much every prison," Dixon's medical needs could be safely addressed at SVSP.  *See, e.g.*, Mot. at

28    12.  Here, there exists a dispute of material fact regarding the adequacy of medical care available

15

1    to Dixon at SVSP-EOP because Dixon suffered harm when the pharmacy ran out of the drug for

2    five days.  *See* Virani Decl., Ex. 26 at AGO 37671-72.  Moreover, the absence of adequate

3    medical care and Clozaril monitoring contributed to Dixon's depression and resulted in acts of

4    self-harm, including by cutting himself and swallowing multiple razor blades.  Virani Decl., Ex.

5    15 at AGO 37231; Dixon Dep. at 26:12-25, 30:10-12, 31:8-12, 31:23-24, 32:2-3.  Accordingly, the

6    Court cannot conclude as a matter of law that the Custodial Defendants were not deliberately

7    indifferent to Dixon's serious medical needs.

8         Defendants separately seek to excuse their decisions to retain Dixon at SVSP-EOP on the

9    basis that "Dixon could not be safely transferred to the other level 4 high security prisons which

10   were designated as Clozapine maintenance facilities, as he had enemy concerns at each of those

11   prisons."  Mot. at 10.  However, the enemy concerns cannot so clearly excuse a constitutional

12   violation centered on the deficiency of medical care.  *See Hudson v. McMillian*, 503 U.S. 1, 6

13   (1992) ("[T]he State's responsibility to provide inmates with medical care ordinarily does not

14   conflict with competing administrative concerns.").  Enemy concerns at other level 4 facilities do

15   not serve as an obvious barrier to the availability of options that would address Dixon's Clozaril

16   maintenance needs, moreover, because the record reveals other alternatives, such as transferring

17   Dixon to level 2 facilities.  *See* Dkt. No. 115-9, Ex. A (Mar. 30, 2022 ICC); Dkt. No. 115-9, Ex. B

18   (June 2, 2022 ICC); *see also* Crayton Dep. at 235:3-13 ("[T]he committee in June of 2022 found

19   that Mr. Dixon wasn't a threat to the general public, including other inmates or staff, to his

20   cellmates nor was he likely to be harmed himself").  In fact, the ICCs granted Dixon a medical

21   override to be transferred to a level 2 institution based on his serious medical needs.  *See* Dkt. 115-

22   9, Ex. A (Mar. 30, 2022 ICC); *id.*, Ex. B (June 2, 2022 ICC).  Such conflicting evidence about

23   Dixon's potential placement precludes judgment for Defendants as a matter of law.

24        In sum, the Custodial Defendants fail to establish that they can avoid liability at this stage.

25   The Court must deny summary judgment as to the Custodial Defendants' alleged deliberate

26   indifference.

27

28

### C.      California Law – Deliberate Indifference

Defendants additionally aver that they are entitled to prevail on Dixon's claim for infliction of cruel or unusual punishment under article I, section 17 of the California Constitution because "there is no private right of action for damages arising out of an alleged violation of the cruel or unusual punishment clause of the California Constitution."  Mot. at 16 (quoting *Giraldo v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 253 (2008)).  Dixon counters that his claim under the California Constitution is made actionable by California's Bane Act.  Opp. at 20-21.

The Bane Act, California Civil Code § 52.1, "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by 'threats, intimidation, or coercion.' " *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) (quoting Cal. Civ. Code § 52.1).  Bane Act claims are viable where the right at issue is "clearly delineated and plainly applicable under the circumstances," and defendants "commit the act in question with the particular purpose of depriving [plaintiff] of his enjoyment of the interests protected by that right." *Sandoval v. County of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (internal quotation marks and citation omitted).  Courts have held that "a prison official's deliberate indifference to serious medical needs is a coercive act" that supports a Bane Act claim.  *See Scalia v. County of Kern*, 308 F. Supp. 3d 1064, 1087 (E.D. Cal. 2018).

Dixon's Bane Act claim, his third cause of action, remains actionable based on the same allegations and evidence giving rise to Dixon's claim for deliberate indifference under the United States Constitution.  And for the same reasons that the Court cannot resolve his claim for deliberate indifference under the United States Constitution, the Court cannot resolve Dixon's corresponding California claim for deliberate indifference as a matter of law.

### D.      Fourteenth Amendment – Equal Protection

Dixon asserts that Defendants treated him differently from similarly situated patients on Clozaril and thereby violated his right to equal protection by violating CDCR's policy and retaining Dixon at SVSP-EOP even though it was not a Clozaril maintenance facility.  *See* Opp. at 21-22.  The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend.

United States District Court
Northern District of California

1    XIV, § 1.  "When an equal protection claim is premised on unique treatment rather than on a

2    classification, the Supreme Court has described it as a 'class of one' action." *N. Pacifica LLC v.*

3    *City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (citing *Vill. of Willowbrook v. Olech*, 528 U.S.

4    562, 564 (2000)).  To support such a claim, a plaintiff advancing a "class of one" action must

5    establish that they have "been intentionally treated differently from others similarly situated and

6    that there is no rational basis for the difference in treatment." *Willowbrook*, 528 U.S. at 564.

7    Therefore, to succeed on their "class-of-one" equal protection claim, a plaintiff must demonstrate

8    that the defendant (1) intentionally (2) treated the plaintiff differently than other similarly situated

9    persons (3) without a rational basis.  *Gerhart v. Lake County*, 637 F.3d 1013, 1022 (9th Cir. 2011).

10   "[T]he rational basis prong of a 'class of one' claim turns on whether there is a rational basis for

11   the *distinction*, rather than the underlying government *action*." *Gerhart*, 637 F.3d at 1023

12   (emphasis in original).  Where there is "any reasonably conceivable state of facts that could

13   provide a rational basis for the classification," the inquiry ends.  *FCC v. Beach Commc'ns, Inc.*,

14   508 U.S. 307, 313-14 (1993).  Under the California Constitution, the "equal protection

15   analysis . . . is 'substantially similar' to [the] analysis under the federal Equal Protection Clause."

16   *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004); *see also Cal. Res. Prod.*

17   *Corp. v. Antioch City Council*, 107 Cal. App. 5th 481, 489-90 (2024) (finding equal protection

18   "class of one" claims similarly viable under the California Constitution).

19          Here, there is little dispute that Defendants' treatment of Dixon differed from their

20   treatment of other similarly situated inmates because housing Dixon at SVSP-EOP directly

21   conflicted with CDCR's own policy, which required that all patients taking Clozaril be housed in

22   Clozaril maintenance facilities.  Virani Decl., Ex. 3 at AGO 79262; *see also* Ex. 34 ("Morrison

23   Dep.") at 84:16-21.  However, Defendants had a rational basis to distinguish Dixon from other

24   inmates prescribed Clozaril.  Dixon was a level 4 inmate who had enemies at all other level 4

25   general population institutions.  Sinclair Decl., Ex. A.  Valley State Prison (VSP) and Mule Creek

26   State Prison (MCSP) were the only general population institutions then capable of maintaining

27   Dixon on Clozapine.  *Id.*  But both of these prisons were designated level 2 facilities with a lower

28   level of security than the level 4 designated for Dixon.  Clark Dep. at 77:3:17.  The overlapping

18

1    custody and medical issues involved in Dixon's placement gave rise to a rational basis for

2    Defendants to distinguish Dixon from other prisoners taking Clozaril. *Cf. Beach Commc'ns*, 508

3    U.S. at 313-14. Though Dixon avers that there remains a dispute of material fact as to whether

4    Dixon could have been transferred a level 2 facility, Opp. at 22, such a dispute of fact does not

5    bear on whether Defendants had a rational basis for the distinction of Dixon as a class of one,

6    *Gerhart*, 637 F.3d at 1023. On this basis, Defendants are entitled to summary judgment on

7    Dixon's equal protection claims under both the United States and California Constitutions.

8        **E.    State Law Claims**

9        Regarding Dixon's remaining state law claims, Defendants initially aver that the Court

10   should simply decline to exercise supplemental jurisdiction over the state law claims based on an

11   improper assumption that the Court would grant summary judgment on his Section 1983 claims.

12   Mot. at 15-16. Having found the Eighth Amendment claim survives for the reasons discussed

13   above, the Court declines Defendants' invitation to reject supplemental jurisdiction. The Court

14   takes up the merits of Defendants' targeted arguments as to each of the state law tort causes of

15   action, including negligence, intentional infliction of emotional distress, and negligent infliction of

16   emotional distress.

17       **1.    Negligence**

18       "[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must

19   show that defendant had a duty to use due care, that [they] breached that duty, and that the breach

20   was the proximate or legal cause of the resulting injury." *Lawson v. Super. Ct.*, 180 Cal. App. 4th

21   1372, 1389 (2010) (alteration in original). "There is a special relationship between jailer and

22   prisoner, imposing on the former a duty of care to the latter." *Giraldo v. California Dep't of*

23   *Corrections and Rehabilitation*, 168 Cal. App. 4th 231, 250 (2008) (omitting quotation marks).

24       Defendants argue that they did not breach any duty owed to Dixon because their conduct

25   was "objectively reasonable." Mot. at 17. But, as other courts have held, "[t]he same allegations

26   supporting liability under a deliberate indifference standard are necessarily sufficient to support

27   liability under a negligence standard." *Est. of Schuck by & through Schuck v. Cnty. of San Diego*,

28   2024 WL 500711, at *14 (S.D. Cal. Feb. 8, 2024) (citing *Villarreal v. Cnty. of Monterey*, 254 F.

1    Supp. 3d 1168, 1191 (N.D. Cal. 2017)).  This Court agrees.  As discussed above, there is sufficient

2    evidence in the record to support a finding that Defendants acted with deliberate indifference to

3    Dixon's serious medical needs, which is sufficient to establish a breach of the duty of care they

4    owed Dixon.  Therefore, the Court denies summary judgment on Dixon's negligence claim.

5                    **2.       Intentional Infliction of Emotional Distress**

6            The elements of the tort of intentional infliction of emotional distress ("IIED") are

7    (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless

8    disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

9    extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

10   defendant's outrageous conduct.  *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (citing *Potter v.*

11   *Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993)).  "Severe emotional distress means emotional

12   distress of such substantial . . . or enduring quality that no reasonable [person] in civilized society

13   should be expected to endure it."  *Hughes*, 46 Cal. 4th at 1051 (quoting *Potter*, 6 Cal. 4th at 1004).

14           Defendants argue, relying on their preceding analysis, that none of their conduct could be

15   said to rise to the level of extreme and outrageous conduct, leaving the remaining IIED elements

16   unchallenged.  Mot. at 17.  However, as discussed above, there exists a dispute regarding whether

17   Defendants engaged in outrageous conduct by refusing to transfer Dixon, knowing that SVSP-

18   EOP was ill-equipped to handle his undisputed medical needs, or whether Defendants behaved

19   reasonably by housing Dixon at SVSP-EOP given his overlapping custody and medical concerns.

20   Such a dispute resists resolution at the summary judgment stage.

21                   **3.       Negligent Infliction of Emotional Distress**

22           In California, "there is no independent tort of negligent infliction of emotional distress."

23   *Potter*, 6 Cal. 4th at 984.  "The tort is negligence."  *Id.*  This claim is thus duplicative of Dixon's

24   general negligence cause of action.  Accordingly, Defendants' motion for summary judgment as to

25   the claim of negligent infliction of emotional distress must be granted.

26           **F.      Qualified Immunity**

27           Public employees "are entitled to qualified immunity under § 1983 unless (1) they violated

28   a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly

United States District Court
Northern District of California

20

1    established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (internal

2    quotation marks omitted). "Either question [of the qualified immunity test] may be addressed

3    first, and if the answer to either is 'no,' then the state actor cannot be held liable for damages."

4    *Gordon v. Cnty. of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S.

5    223, 236 (2009)). "For a constitutional right to be clearly established, its contours 'must be

6    sufficiently clear that a reasonable official would understand that what he is doing violates that

7    right.' " *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635,

8    640 (1987)). Under the deliberate indifference standard, it is "well settled that prison officials

9    violate the Constitution when they choose a course of treatment that is medically unacceptable

10   under all of the circumstances." *Gordon*, 6 F.4th at 970 (quotations omitted). If a prison official

11   is aware of a present "substantial risk to [an inmate's] health," including a psychiatric risk, they

12   may not simply "decline[ ] to act upon this knowledge." *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d

13   1175, 1194 (9th Cir. 2002), overruled on other grounds by *Castro v. Cnty. of Los Angeles*, 833

14   F.3d 1060, 1071 (9th Cir. 2016).

15        Here, there remains significant dispute as to whether Defendants' course of treatment for

16   Dixon, including retaining him at SVSP-EOP, was medically acceptable under all the

17   circumstances. The Court finds that granting qualified immunity to Defendants turns on accepting

18   their version of disputed facts, particularly that Dixon need not be transferred to a CDCR-

19   designated Clozaril maintenance facility because he could have been properly treated and

20   maintained at SVSP-EOP. As a result, qualified immunity is not appropriate at present. *See*

21   *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 630 (9th Cir. 2022) (holding "[c]ritical

22   disputes of fact render[ed] summary judgment premature" in police violence case where police

23   claimed qualified immunity); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th

24   Cir. 2010) (affirming denial of summary judgment on qualified immunity grounds because there

25   were genuine issues of fact regarding whether the officers violated plaintiff's Fourth Amendment

26   rights, which were also material to a proper determination of the reasonableness of the officers'

27   belief in the legality of their actions). Accordingly, Dixon may proceed on his theory that

28   Defendants were deliberately indifferent to his medical needs because he was subject to a course

United States District Court
Northern District of California

1   of psychiatric treatment that, left inappropriately monitored and supported, created a substantial

2   risk of serious harm.  *See Gordon*, 888 F.3d at 1125.

3   **III.     CONCLUSION**

4           For the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part**

5   Defendants' motion for summary judgment.  The Court **DENIES** summary judgment as to

6   Dixon's claim of deliberate indifference under both the United States and California Constitutions,

7   **GRANTS** summary judgment on Dixon's claim of equal protection violations under both the

8   United States and California Constitutions, **DENIES** summary judgment as to the state tort claims

9   of negligence and IIED, **GRANTS** summary judgment as to the claim of NIED, and **DENIES**

10  qualified immunity based on the remaining disputes of material fact.

11          At the hearing, the parties stated their willingness to return to the settlement table after the

12  issuance of this order.  The Court therefore **REFERS** the parties to Magistrate Judge Robert M.

13  Illman for a further settlement conference.  Within seven (7) days following the further settlement

14  conference, the parties shall submit a status report regarding the outcome of the conference, and, if

15  necessary, they shall propose a trial and pretrial schedule.

16

17          **IT IS SO ORDERED.**

18  Dated: November 10, 2025

19

20  _____

21  **ARACELI MARTÍNEZ-OLGUÍN**
    **United States District Judge**

22

23

24

25

26

27

28

United States District Court
Northern District of California